IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DONALD DARNELL STROMAN, #282365,   *
                Petitioner,
v                              *    CIVIL ACTION NO. WMN-05-478

WILLIAM WILLIAMS, et al.        *
                Respondents.

*****

**MEMORANDUM**

On February 17, 2005, the Clerk received for filing Donald Darnell Stroman's ("Petitioner") 28 U.S.C. § 2254 attack on his 1998 convictions and 1999 sentences in Prince George's County Circuit Court for first degree murder, attempted first degree murder, and a handgun offense. Paper No. 1. Respondents filed an Answer to the Petition and Petitioner filed a Reply. Paper Nos. 9 and 12. On October 18, 2005, the court entered a Memorandum and Order denying and dismissing the above-captioned Petition for Writ of Habeas Corpus. Paper Nos. 14 and 15. On October 28, 2005, Petitioner filed a Motion for Extension of Time to file a Motion for Reconsideration of the October 18, 2005 dismissal. Paper No. 16. Petitioner's Motion was granted. Paper No. 19. Petitioner also filed a Motion for Reconsideration as well as a "Motion Requesting all Exhibits filed by Respondents." Paper Nos. 20 and 18, respectively. On February 16, 2006, in light of the Fourth Circuit Court of Appeals' decision in *Thompson v. Greene*, 429 F.3d 263 (4th Cir. 2005) (holding that the Office of the Maryland Attorney General's ("OAG") failure to serve habeas exhibits violated the procedural rules governing service of such exhibits in habeas corpus proceedings), the October 18, 2005 Memorandum and Order were vacated (Paper No. 21), Respondents were directed to provide Petitioner a copy of all exhibits, and Petitioner was provided an additional opportunity to file a Reply to the Answer. In compliance with the February 16, 2006 Order, Respondents provided

Petitioner a copy of all exhibits filed with their Answer.  Paper No. 22.  The court is now in receipt

of Petitioner's supplemental reply.  Paper No. 23.

After consideration of all of the pleadings and exhibits, the court sees no need for an

evidentiary hearing.  *See* Rule 8(a), *Rules Governing Section 2254 Cases in the United States*

*District Courts; see also* 28 U.S.C. § 2254(d) & (e)(2).  For reasons to follow, the Petition is hereby

denied and dismissed with prejudice.

## I. Procedural History

On May 8, 1998, Petitioner was indicted on charges of murder, attempted murder, conspiracy

to commit robbery, and related offenses.  Paper No. 9, Ex. 1.  The facts adduced at trial are as

follows:

> Officer Robert Cease testified that he responded to a call for a stabbing on the
> evening of April 12, 1998.  When he arrived at the scene, he found two victims
> suffering from multiple stab wounds. The first victim, Ola Akintogunde, was lying
> on the grass in front of an apartment building. The second victim, Vincent Anazia,
> was on the front porch. The officer secured the scene and waited for the paramedics.
> Mr. Anazia died as a result of his injuries.

> Akintogunde testified that he lived with his friend, Anazia.  Akintogunde
> knew Tia Hill as Anazia's girlfriend, whom he had met on several occasions.  He
> said that on April12, 1998, Hill came to their residence.  He described Hill as being
> "restless."  After a brief conversation with Anazia, Hill apparently left to pick up a
> friend and bring her back to the apartment.  The door remained unlocked.

> Akintogunde testified that only minutes later, Hill returned with a male.  He
> then felt someone grab his neck from behind and realized a knife was being held at
> his throat.  The man told Akintogunde that if he made a move he would cut his
> throat.  He testified that Anazia told Hill that she knew where the money was kept
> and that she should go get it.  Akintogunde then felt his neck being cut. He tried to
> fight back and a struggle ensued.  He described the weapon as being long with a
> "jagged edge."  He was stabbed several times.  He recalled seeing Hill in front of the
> door trying to block Anazia from leaving the apartment. Akintogunde testified that
> when he started to scream for help the attacker left him, went over to Anazia and
> stabbed him in the back.  He stated that Anazia fell backwards and then Hill and the
> assailant ran from the dwelling.

Akintogunde testified that both he and Anazia were trying to get outside for help when he saw the assailant briefly re-enter the apartment. Anazia eventually fell on a grassy area outside the apartment. Akintogunde testified that he alerted a neighbor and asked him to call the police. Akintogunde later identified the [Petitioner] from a photographic array and identified [Petitioner] in court.

State's witness, Clifton Holmes, testified that late on the evening of April 12, 1998, Hill, his cousin, arrived at his home. Accompanying Hill was her brother-in-law [Petitioner]. Holmes indicated that [Petitioner] "was bloody from pants down." Holmes gave [Petitioner] a change of clothing and a plastic bag. He also gave him some ice because [Petitioner] had cut his hand. He testified that [Petitioner] put his discarded clothes in the plastic bag after changing.

Paper No. 9 Ex. 9 at pp. 1-3.

The case proceeded for trial before Circuit Court Judge Michel D. Hotten in November, 1998. On November 12, 1998, the jury returned its verdict finding Petitioner guilty of: first degree murder, felony murder, and second degree murder of Vincent Anazia; attempted first degree and second degree murder of Ola Akintogunde; attempted robbery with a deadly weapon as to Vincent Anazia; first degree and second degree assault as to Ola Akintogunde; carrying a dangerous weapon openly; conspiracy to commit robbery with a dangerous weapon as to Vincent Anazia; and conspiracy to commit robbery as to Vincent Anazia. Paper No. 9, Ex. 5 at pp. 77-79. On January 22, 1999, Judge Hotten sentenced Petitioner to a term of life for the murder of Vincent Anazia and to a consecutive eighty year term for the attempted murder of Ola Akintogunde, and a three year term, concurrent to the life sentence, for carrying a dangerous weapon openly with the intent to injury. All other convictions merged. *Id.*, Ex. 6 at p. 21.

On appeal to the Court of Special Appeals of Maryland, Petitioner contended that the sentence for attempted first degree murder was subject to reversal and that the evidence was insufficient to support his convictions. *Id.*, Exs. 7 & 8. In an unreported opinion filed on April 11, 2000, the Court of Special Appeals of Maryland affirmed Petitioner's convictions. *Id.*, Ex. 9. A

petition for writ of certiorari, raising the same contentions of error, was filed and subsequently denied by the Court of Appeals of Maryland on July 24, 2000. *Id*., Exs. 10 & 11.

On July 12, 2001, Petitioner filed for post-conviction review in the Circuit Court for Prince George's County. *Id*., Ex. 1. On September 18, 2002 and September 3, 2003, a post-conviction hearing was held before Prince George's County Circuit Court Judge Michael P. Whalen. Paper Nos. 12 & 13. Judge Whalen denied the petition. *Id*., Ex. 14.

Petitioner filed an application for leave to appeal in the Court of Special Appeals, alleging that the post conviction court erred in rejecting his claim that: (1) the prosecution had violated *Brady v. Maryland*, 373 U.S. 83 (1963); and (2) trial counsel rendered ineffective assistance by failing to cross-examine the co-defendant concerning use and derivative use immunity. *Id*. Exs. 15-18. On January 11, 2005, the Court of Special Appeals summarily denied the application for leave to appeal. *Id*., Ex. 19.

Petitioner filed this § 2254 Petition on February 17, 2005, alleging that his convictions should be overturned based upon the ineffective assistance of trial counsel and misconduct of the prosecutor. Petitioner claims that:

1.  Trial counsel failed to investigate because he felt the State's discovery was sufficient and also failed to cross examine Petitioner's co-defendant;

2.  Assistant State's Attorney Belinda Gardner withheld *Brady* material; and

3.  The post conviction court identified the correct legal principle [in addressing Petitioner's *Brady* claim], however, the post conviction court assumed that because the state's evidence was overwhelming Petitioner could not prove that the outcome would have been different.

Paper No 1.

## II. Threshold Considerations

4

## A.  Exhaustion of State Remedies

Under *Rose v. Lundy*, 455 U.S. 509 (1982), before a petitioner may seek habeas relief in federal court, he is required to exhaust each claim presented to the federal court by pursuing all available remedies available in state court.    This exhaustion requirement is satisfied by seeking review of the claim in the highest state court with jurisdiction to consider the claim.  *See* 28 U.S.C. § 2254(b) and (c).  In Maryland, this may be accomplished by proceeding with certain claims on direct appeal to the Court of Special Appeals (and thereafter seeking *certiorari* to the Court of Appeals) and with other claims by way of  a post-conviction petition, followed by seeking leave to appeal from the Court of Special Appeals.  Petitioner no longer has direct appeal or post-conviction remedies available in connection with the claims raised before this Court.  He has exhausted the claims presented here.

## B. Statute of Limitations

There is no contention that the Petition is time-barred pursuant to 28 U.S.C. §2244(d).

## C.  Procedural Default

In their answer, Respondents state that Petitioner is procedurally defaulted from asserting his claim that trial counsel rendered ineffective assistance by failing to investigate.  Paper No. 9. The procedural default doctrine ensures that "state courts have had the first opportunity to hear the claim sought to be vindicated in a federal habeas proceeding." *Picard v. Connor*, 404 U.S. 270, 276 (1971).  In *Wainwright v. Sykes*, 433 U.S. 72 (1977), the Court held that consideration of a claim in a petition for habeas corpus can be barred by failure to comply with state procedural rules, unless the petitioner makes a showing of cause for the failure and prejudice resulting from the failure. Thus, claims which have never been presented in the state courts--or claims which were not exhausted properly in the state courts--are procedurally defaulted if presentation of the claims in

state court would be barred by state procedural rules.  *See Collier v. Jones*, 910 F.2d 770 (11th Cir. 1990).  This procedural bar applies when the state court has found procedural default regardless of whether it has also discussed the merits, as long as the court has explicitly invoked state procedural rule as the basis for its decision.  *See Harris v. Reed*, 489 U.S. 255, 264, n.10 (1989); *Ahe v. Styles*, 39 F.3d 80 (4th Cir. 1994).  The *Harris* Court emphasized that a federal court has the responsibility to determine whether a state court in fact based its denial of relief on procedural grounds.

The court agrees with Respondents that Petitioner's claim regarding ineffective assistance of counsel in failing to investigate has been procedurally defaulted.  Petitioner failed to raise this claim in his application for leave to appeal the denial of  post conviction relief.

Even where a claim has been procedurally defaulted,  this court must still consider whether it should reach the merits of the defaulted claim in order to prevent a fundamental miscarriage of justice.  *See Schlup v. Delo*, 513 U.S. 298 (1995).  The miscarriage of justice standard is directly linked to innocence.  *Id*. at 320.  Innocence is not an independent claim; rather, it is the "gateway" through which a petitioner must pass before a court may consider constitutional claims which are defaulted.  *Id*. at 314.  The miscarriage of justice exception applies where a petitioner shows that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*,  477 U.S. 478, 496 (1986); *Schlup*, *supra*.  To meet this standard a petitioner must show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.  *Schlup*, 513 U.S. at 327.

> *Schlup* observes that
>
> a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare . . . To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence--whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence--that was not presented at trial.

*Id.* at 323.

On June 9, 2005, the court entered an Order affording Petitioner an opportunity to demonstrate the existence of cause for his failure to properly raise his claims in the state courts and prejudice resulting from this failure.  Paper No.  10.  In response, Petitioner essentially repeats his claims and argues that the ineffective assistance of counsel claim is "part and parcel" of his *Brady* claim.  To the extent Petitioner contends that the failure of the State's Attorney to provide proper discovery to defense counsel impeded his defense, his contention shall be considered below: to the extent, however,  he claims as an independent basis for habeas relief that trial counsel was deficient in properly investigating his case, the claim is procedurally defaulted, as Petitioner failed to raise this claim in his application for leave to appeal the denial of post conviction relief.[1]  Petitioner has failed to make the requisite showing which would enable this court to consider a separate claim of ineffective assistance of counsel based on a failure to investigate.   He has presented no evidence, nor suggested that any exists, which could satisfy the difficult standard set forth in *Schlup*. Petitioner's procedurally defaulted claim is, therefore, foreclosed from federal habeas review.

### III.  Standard for § 2254 Review

Because this Petition was filed after April 24, 1996, it is to be decided under amendments to the habeas corpus statutes contained in the Antiterrorism and Effective Death Penalty Act ("AEDPA").  *See Woodford v. Garceau*, 538 U.S. 202, 207 (2003); *Beck v. Angelone*, 261 F.3d 377, 380 n.3 (4th Cir. 2001).   AEDPA modified the federal court's role in habeas proceedings in order

---

[1]Even if the claim were properly raised, it would entitle Petitioner to no relief.  Petitioner has not offered any evidence that but for the alleged deficient performance of trial counsel, the result of the trial would have been different. As noted below, Mr. Garcia's description of the assailant, while differing from Petitioner's actual height, matched Petitioner's physical description in other respects.  Mr. Garcia observed the assailant from a distance and provided a cursory description of the assailant's race, gender, and height.  The fact that counsel could have conducted a more thorough investigation that might have borne fruit does not establish that the attorney's performance was outside the wide range of reasonably effective assistance. *See Burger v. Kemp*, 483 U.S. 776, 794-95 (1987).

to prevent federal "retrials" and to ensure that state court convictions are given effect to the extent possible under law. *See Bell v. Cone*, 535 U.S. 685, 693 (2002).  Pursuant to statute, a federal court may not grant a writ of habeas corpus unless the state's adjudication on the merits:

> 1)      resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> 2)      resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Section 2254(d) is a "highly deferential standard for evaluating state-court rulings," *Lindh v. Murphy*, 521 U.S. 320, 333,  n.7 (1997), "which demands that state court decisions be given the benefit of the doubt," *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (*per curium*).  In *Williams v. Taylor*, 529 U.S. 362 (2000), Justice O'Connor explained that a state court decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  *Id*. at 412-413.  A state court decision is based on an "unreasonable application" of clearly established federal law when "the state court  identifies the correct  governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Id*.  "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable."  *Id*. at 409-410; *see also Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003); *Booth-el v. Nuth*, 288 F.3d 571, 575 (4th Cir. 2002).

Further, federal courts must give great deference to a state court's factual findings.  *See Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000).  Section 2254(e)(1) provides that a determination of

a factual issue made by a state court shall be presumed to be correct absent clear and convincing evidence to the contrary.   The applicant has the burden of rebutting the presumption of correctness. A decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding.  *See Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

With these standards in mind, the court will address the merits of Petitioner's claims.

**D.    Petitioner's Sixth Amendment Claim**

To establish a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984), a convicted defendant must demonstrate that his counsel's performance (1) "fell below an objective standard of reasonableness," and (2) that counsel's deficient performance prejudiced the defendant. *Id*. at 688, 692.  "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id*. at 686.  The ultimate focus of the *Strickland* inquiry is on the "fundamental fairness of the proceeding whose result is being challenged." *Id*. at 696.

In evaluating whether counsel's performance fell below an objective standard of reasonableness, a court must consider "whether counsel's assistance was reasonable considering all the circumstances." *Id*. at 688.   In its analysis, a court must be "highly deferential," and "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id*. at 689 (internal quotations omitted).  A court must not use the benefit of hindsight to second-guess strategic decisions made by counsel unless they were unreasonable. *Id*. at 690.

9

With regard to the prejudice prong of *Strickland*, a defendant need not demonstrate that the outcome of the proceeding would have been different, but rather that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.   Even if counsel committed a professionally unreasonable error, relief can be granted only if "counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair."   *See Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993).

Petitioner contends that   trial counsel's failure to cross-examine co-defendant Tia Hill constituted ineffective assistance of counsel.   In his post-conviction decision, Judge Whalen found that trial counsel's decision not to cross examine Tia Hill was based on sound trial strategy.   Paper No. 9, Ex. 14, pp. 12-15.   The post conviction court's finding is supported by the record.

Tia Hill was called to the witness stand and invoked her Fifth Amendment right not to testify. The State compelled her testimony by granting her "use and derivative use" immunity.   Ms. Hill's testimony consisted of the following:

> MS GARDNER:  On April 12, 1998, where did you go?
> MS. HILL:     Over my friend Vincent's house.
> Q:      Who was with you?
> A:      Darnell Stroman.

[Hill then identified the Defendant and the state proceeded as follows.]

> MS. GARDNER:       Miss Hill, on April 12th, of 1998, did you stab anyone?
> Mr. MARTUCCI: Objection.
> THE WITNESS: No.
> THE COURT: Basis?
> MR. MARTUCCI: She is leading.
> THE COURT: Sustained.
> MS. GARDNER: I have no further questions. Your witness.
> MR. MARTUCCI: No question[s].

Paper No. 9, Ex. 5, pp 3-4.

10

Trial counsel testified at the post conviction hearing that his decision not to cross-examine Ms. Hill was a strategic decision given the very limited nature of Ms. Hill's testimony.  Paper No. 9, Ex. 12, pp. 43-48.  Counsel determined "that discretion being the better part of valor that [he] would leave that witness alone.  That she had not done as much damage as she could have done." *Id.*, Ex. 12 at 45.  Consonant with that determination, trial counsel attempted to question the limited nature of Ms. Hill's testimony during his closing argument.  *Id.*, Ex. 5, pp. 60-64.        Absent clear and convincing evidence to the contrary, a claim that counsel's decision was premised on trial strategy cannot be disturbed.  *See Evans v. Thompson***,** 881 F.2d 117, 125 (4th Cir. 1989).  Having examined the post-conviction court's ruling and having independently examined the record, this court is satisfied that Petitioner has not demonstrated that counsel's performance was deficient or that he was prejudiced by the conduct of trial counsel.  *See* 28 U.S.C. § 2254(d);  *see also  Stamper v. Muncie*, 944 F.2d 170, 178 (4th Cir. 1991) (challenge to counsel's trial decisions and/or tactics amounted to no more than "Monday morning quarter backing.").  Accordingly,  the court sees no reason to overturn Judge Whalen's decision.  His findings do not involve an unreasonable application of *Strickland* and more than satisfy the   §2254(d) standard of review.  The post conviction court's decision shall not be disturbed.

**E.**     **Violation of *Brady v. Maryland*, 373 U.S. 83 (1963).**

In dismissing Petitioner's *Brady* claim, the post conviction court found as follows:

> Petitioner claims that the State failed to disclose exculpatory evidence in violation of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).  At Petitioner's first post-conviction hearing, trial counsel testified that a police canvass report involving the observations of Raphael Garcia [State's exhibit #1] was not disclosed to him at any time before trial.  In fact, State and Post-conviction counsel stipulated at the second Post-conviction hearing that indeed, the State did not provide this report to trial counsel in discovery.  The parties have also stipulated to the absence of bad faith on behalf of the State.  Because the state does not dispute that it failed to provide this information to counsel, the inquiry, then, becomes whether the failure of the State to provide this information to trial counsel was a <u>Brady</u> violation.

The Supreme Court, in Brady, stated that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material, either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecutor." Id. at 87.  In order to prove a <u>Brady</u> violation, Petitioner must establish "(1) that the prosecutor suppressed or withheld evidence that is (2) favorable to the defense–either because it is exculpatory, provides a basis for mitigation of sentence, or because it provides grounds for impeaching a witness–and (3) that the suppressed evidence is material." <u>Wilson v. State</u>, 363 Md. 333, 345 (2001) (*quoting* <u>Ware v. State</u>, 348 Md. 19, 38 (1997).

The police canvass form indicates that Detective C. Smith of the Prince George's County police knocked on the door of Mr. Raphael Garcia's home the day after the incident (April 13, 1998).  Under the "information" portion of the canvass form, the detective wrote the following:

"Heard arguing next door.  Saw man running toward parking lot holding ktichen knife.  Victim #2 knocked on his door.  He looked out, Victim #2 walked across yard.

Suspect: B/M/5'9"/White-blk hat (stocking type)"
To the side of the information the detective wrote, "Doesn't speak good English."
[State's exhibit #1].

Petitioner argues that this report corroborates the initial statement given by the victim, in which he describes his assailant as being "5'7, 170 lbs". [State's exhibit 13, page 35].  In fact, Petitioner was 6'1, 240 lb. at the time of the incident.  Petitioner argues that this information was favorable to the defense because it identified someone other than the Petitioner as the assailant.  Additionally, Petitioner argues that this evidence is material, in that the suppression of the report caused prejudice sufficient to undermine confidence in the outcome of the trial.

In response, the State argues that the evidence contained in the canvass report is not favorable or material.  The State argues that the Petitioner is incorrect in his assertion that the neighborhood canvass identified someone other than the Petitioner as the assailant.  Rather, the State argues, it is merely a description of an individual's perceived height made from a distance.  Moreover, the State contends that the evidence is not a prior inconsistent statement of Akintogunde and is therefore not impeachment evidence.  According to the State, the Petitioner has not met his burden to show materiality, that is, that the evidence, if favorable, could reasonably be taken to put the whole case in a different light, so as to undermine confidence in the verdict.

The State also notes that Mr. Garcia's name and telephone number were listed on a police incident report that was provided in pre-trial discovery. [State's exhibhit #13, page 13].  Other than the victims and responding police officers, Mr. Garcia is the only witness listed on this report.  The State asserts that in light of this,

the police canvass was not "favorable" evidence to the Defense, because it was
merely cumulative to evidence that they already had.  At the post-conviction hearing,
trial counsel indicated that he had recived a copy of this report, but that he could not
recall whether he had contacted Mr. Garcia.  The Petitioner argues that nothing in
this report gives any indication that the information Mr. Garcia had was
exculpatory,[8] thereby making the police canvass more essential for purposes of
discovery.

The State concedes that the first prong of <u>Brady</u> has been met; however, the
second prong must be addressed.  The second prong of <u>Brady</u> requires the Petitioner
to prove that the evidence in question is favorable to the defense because it is
exculpatory, provides a basis of mitigation of sentence, or because it provides
grounds for impeaching a witness.  <u>Wilson v. State</u>, 363 Md. 333 (2001).  This court
finds that the suppressed report was favorable to the defense because it was
potentially exculpatory, in that it was similar to Akintogunde's description of the
assailant's height, and several inches short of Petitioner's actual height.  At the very
least, it may have helped trial counsel attack Akintogunde's indentification of his
assailant.

Finally, the court must determine whether the third prong of <u>Brady</u> has been
met; that is, whether the suppressed evidence was material, <u>Wilson</u>, 363 Md. at 345.
Evidence is material if there is a "reasonable possibility that, had the evidence been
disclosed to the defense, the result of the proceeding would have been different.  A
reasonable probability is a probability sufficient to undermine confidence in the
outcome." <u>Conyers v. State</u>, 367Md. At 598 (*quoting* <u>Strickland v. Washington</u>, 466
U.S. 668 (1984)).

Petitioner argues that this evidence was material, because the suppression of
this report by the State prevented Petitioner from presenting a viable defense to the
jury-namely, that another person was responsible for this crime.  Additionally, the
Petitioner contends that if trial counsel had known of this information, it would have
changed the direction of the Petitioner's case and that he could have attacked
Akintogunde's identification of the Petitioner much more effectively.  The fact that
Petitioner was unable to present this defense is enough, according to Petitioner, to
"undermine confidence in the outcome."  <u>Conyers</u>, 367 Md. At 598 (*quoting*
<u>Strickland v. Washignton</u>, 466 U.S. 668 (1984)).

The court finds that the suppressed evidence, while favorable to the defense,
was not material, because this Court is not persuaded that if Mr. Martucci had
received this report, that there is a reasonable probability that the Defendant would
not have been convicted.

The trial transcripts reveal that the State's case against the Defendant was
overwhelming.  The Petitioner was identified by the victim in a photo array [State's
exhibit #6] and an in-court identification. Tr. II-38 & 78.  The victim testified that
the co-defendant, Tia Hill, whom he had met on several prior occasions came to the

apartment that evening, left, and returned with the Petitioner. Tr. II-4 to 26. He testified that Petitioner held a knife to his throat and that Ms. Hill demanded money from Anazia. Tr. II 26 to 27. The victim testified that he struggled with the Petitioner, and was stabbed several times during the course of that struggle. Tr. II-32. Additionally, the victim testified that he recalled seeing Ms. Hill blocking the front door. Tr. II-30. When he started screaming for help, the victim testified, the Petitioner left him and stabbed Anazia in the back, after which Hill and Petitioner fled the apartment. Tr. II 33-34. Finally, Tia Hill testified at trial that Petitioner was with her on April 12, 1998 when she went to Vincent Anazia's home. Tr. III-3.

Gloria Holmes, Defendant's mother-in-law[9] gave a statement to police and testified that the Defendant called for Tia Hill on the evening of the incident and told Ms. Holmes that he was on his way to pick Ms. Hill up. Tr. I-32. Ms. Hill was at her aunt's house, and Ms. Holmes testified that she called her at that location to relay the message from Petitioner. She also testified that she did not see Ms. Hill leave with Petitioner, but she was certain that Ms. Hill did, in fact, leave the residence. Tr. I-33.

Clifton Holmes[10] gave the police a statement and testified that Ms. Hill and Defendant, both personally known to him, arrived at his house between 11 and 11:30- on April 12, 1998, wearing bloody clothes, and that he gave the Defendant a change of clothes, a plastic bag, and ice for his hand. Tr. I-43-52. He also testified that the Petitioner indicated that they had been fighting. Tr. I-49.

While this court acknowledges that the police canvass report contained information favorable to the Defendant, it does not find that Mr. Garcia's observation of a "man running...holding a kitchen knife" and his brief description of that man (B/M/5'9) was so strong as to undermine confidence in the verdict. Mr. Garcia's description differed only with respect to height. In light of the powerful evidence against the Petitioner, this court does not believe that this difference is enough to undermine confidence in the verdict, especially because three of the witnesses who provided evidence against him and who testified at trial were related to the Petitioner.[11] Therefore, this Court finds that the State's failure to provide the canvass report in discovery although favorable to Petitioner, was not material, and accordingly, was not a <u>Brady</u> violation.

───────────────────

[8]In the alternative, the Petitioner argues that trial counsel's failure to contact Mr. Garcia amounted to ineffective assistance of counsel, which has been previously analyzed.

[9]Ms. Holmes is also Co-defendant Hill's mother.

[10]Clifton Holmes is Co-defendant Hill's cousin.

[11]Tia Hill was Petitioner's sister-in-law; Gloria Holmes was Petitioner's mother-in-law; and Clifton Holmes was Petitioner's "cousin-in-law."

Paper No. 9, Ex. 14 at pp. 18-23.

As noted by the post conviction court, in order for a failure to disclose exculpatory or favorable evidence to rise to a constitutional level, there must be a reasonable probability that the results of the proceeding would have been different had the evidence been disclosed. *See Strickler v. Greene*, 527 U.S. 263 (1999); *United States v. Bagley*, 473 U. S. 667, 682 (1985). While the post conviction court found that the canvass report was favorable to Petitioner and was suppressed by the State, it did not find that the results of the proceeding would have been different had the evidence been disclosed. This court agrees. While the description of the attacker provided by Mr. Garcia in the canvas report differed from Petitioner's actual height, Mr. Garcia viewed the attacker fleeing the scene from a distance for presumably a few seconds. Contrary to Petitioner's claim of innocence, Tia Hill, the co-defendant and Petitioner's sister-in-law, placed Petitioner at the scene of the crime. The surviving victim identified Petitioner as his attacker both in a pretrial photo array and in court.[2] Clifton Holmes testified that he encountered Petitioner and the co-defendant on the night of the attack, that Petitioner had blood on his clothes and shoes, and that Petitioner told Mr. Holmes he had been in a fight. In light of the foregoing, Mr. Garcia's description of the man fleeing the scene does not "put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995). Accordingly, the court finds that the state court's decision rejecting Petitioner's claim that he was prejudiced by the state's failure to disclose evidence is  neither contrary to clearly established federal law as determined by the United States

[2]The jury was aware that the victim's initial description of his attacker described the assailant at 5'7 and that Petitioner is 6'1.  Paper No. 9, Ex. 4, pp. 44-49.

Supreme Court, nor involves an unreasonable application of that law.  The post conviction court's review of Petitioner's claim withstands scrutiny under 28 U.S.C. § 2254(d)(1) and (2).

## IV. Conclusion

In light of the foregoing,  the court finds no basis to overturn Judge Whalen's decision. Accordingly,  this Petition for habeas corpus relief shall be denied and the case shall be dismissed with prejudice.  A separate Order follows.


/s/

Date:    May 18, 2006        _____

William M. Nickerson
United States District Judge